PEOPLE· ex rel. NEW YORK CENT. & H. R. R. CO. v. MEALY et al., City Assessors.

PEOPLE ex rel. TROY UNION R. CO. v. SAME.

(Supreme Court, Special Term, Albany County. January, 1915.)

CONSTITUTIONAL LAW &#9685;&#10142;138—MUNICIPAL CORPORATIONS &#9685;&#10142;957—IMPAIRMENT OF CONTRACTS—ASSESSMENT OF RAILROAD PROPERTY—LIMITATION OF AMOUNT—REPEAL OF STATUTE—VALUE.

Where, by an agreement between a city and a railroad corporation organized under General Railroad Law 1850, c. 140, it was agreed that the city council should join in an application to the Legislature that the company be exempt from taxation, on an amount exceeding its capital stock, Laws 1853, c. 462, providing that the railroad property should be assessed for city and county purposes as agreed by the contract to which the statute referred, was based on no consideration passing to the state, and neither made the state a party to the contract nor created a new contract between the state and the railroad company; and hence the repeal of such statute by Laws 1909, c. 201, was not in contravention of Const. U. S. art. 1, § 10, subd. 1, which prohibits the enactment of any statute impairing the obligation of contracts.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 303, 408; Dec. Dig. &#9685;&#10142;138; Municipal Corporations, Cent. Dig. §§ 2015–2022; Dec. Dig. &#9685;&#10142;957.]

&#9685;&#10142;For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Writs of certiorari by the People, on the relation of the New York Central & Hudson River Railroad Company, and on the relation of the Troy Union Railroad Company, against G. Frank Mealy and others, as Assessors of the City of Troy, to review assessments against railroad properties. Proceedings dismissed, and writs of certiorari quashed.

Lewis E. Carr and William L. Visscher, both of Albany, for relators.

Charles I. Webster, Corp. Counsel, of Troy (George B. Wellington, of Troy, of counsel), for defendants.

CHESTER, J. The matters under these writs have been referred to a referee to take evidence and to report the same to the court, with his findings of fact and conclusions of law. The evidence has been taken and the report made. The proceedings have come on for determination upon the evidence so taken and the report so made. Both proceedings have been heard and are to be tried together.

The assessments brought up for review are as follows:

"Troy Union Railroad Co., Boston and Maine Railroad Co., Deleware and Hudson Railroad Co., New York Central and Hudson River Railroad Co.

"The lands of roadbed and adjacent thereto in the several wards of the city, with rails, superstructures, depot buildings and appurtenances, being all the railroad property in the city of Troy, located between Madison St. on the south, Hoosick St., on the north, and the approach of the Delaware and Hudson Company's bridge on the west, excepting that portion assessed as franchises lying in public streets.

"(Valuation, $1,000,000.)   (Real property.)

"Special franchise, 1911.   $315,400."

There is substantially no dispute concerning the facts, which are, however, somewhat voluminous, and involve to a considerable extent the history of all the railroads entering the city of Troy for over half a century. It appears that prior to the year 1851 four railroads had their termini in that city, viz., the Rensselaer & Saratoga, the Troy & Boston, the Schenectady & Troy, and the Troy & Greenbush. The three first named came down River street, discharging and receiving passengers at different places—the Rensselaer & Saratoga at the Troy House, the Troy & Schenectady at the foot of State street, and the Troy & Boston in front of the Mansion House. The Troy & Greenbush came in from the south, having its terminus at the junction of Adams and River streets. The cars of the Rensselaer & Saratoga and Troy & Schenectady stopped at Green Island, and were drawn over the bridge of the Rensselaer & Saratoga and down River street to their respective termini by horses; those of the Troy & Boston were drawn down River street from Hoosick street to its terminus by horses; those of the Troy & Greenbush were brought up to its terminus by horses. There was no connection between the four roads, except that the three first named used the same tracks on River street from the Rensselaer & Saratoga bridge south to their respective termini. This being the situation, negotiations were had between the city officials and representatives of the four railroad companies, which resulted in an agreement between them which bore date December 3, 1852, under which the tracks of the several railroad companies were to be taken out of Riv-

er street, and a single railroad for the joint use of the four companies was to be built on a new line, to enter a union passenger station on Sixth avenue, which new line and passenger station were to be constructed for the joint use of the four companies, who could thereupon get into and through the city of Troy with their locomotives.

The Legislature had by chapter 255 of the Laws of 1851 passed an act to authorize the city of Troy and certain railroad corporations to subscribe for and become the owners of stock for the construction of a railroad through the whole or some portion of the city. That law provided that the city of Troy and the several railroad corporations whose roads entered the city might subscribe for and become the owners of stock in a railroad corporation to be formed under the then General Railroad Law (act of 1850) for the construction of a railroad with one or more tracks through the city. Commissioners were appointed to locate the proposed railroad, subject to the approval of the common council. The act also provided that the city of Troy might borrow upon its bonds a sum not exceeding the cost of the construction of such railroad, and that the city was to be indemnified against payment of the principal and interest of such bonds by a mortgage to be executed by such proposed corporation on the railroad to be constructed, its capital stock and franchises, and by guarantee obligations of the several railroad corporations authorized to subscribe for stock.

Shortly after the passage of the above law, the Troy Union Railroad Company was organized under General Railroad Law 1850, c. 140, by filing its articles of association on July 31, 1851. Its capital stock was fixed at $30,000, its corporate existence limited to 100 years, and the length of its road was not to exceed 3 miles through the city of Troy. The agreement of December 3, 1852, hereinbefore mentioned, was made between the city of Troy, the Troy Union Railroad Company, the Rensselaer & Saratoga Railroad Company, the Schenectady & Troy Railroad Company, the Troy & Boston Railroad Company, and the Hudson River Railroad Company, which had theretofore leased the Troy & Greenbush Railroad. It is not necessary to refer to all the details of this voluminous agreement. Reference to a few of its provisions, however, is essential. By its terms it was agreed that the Troy Union Railroad Company should construct, maintain, and operate a railroad in the city of Troy, and that the present owners of the stock of that company, except those who held stock for the purpose of making them directors, should transfer the same to the four railroad companies named, in order that each might have an equal amount of the stock. It was provided that the city of Troy should issue its bonds to enable the Troy Union Railroad Company to build the road and passenger house, and that such Troy Union Railroad Company would execute to the city of Troy a mortgage to secure the bonds, and that the four railroad companies would indemnify the city of Troy against the principal and interest of such bonds. It was also agreed that each railroad company should be permitted to use the railroad, which was to be constructed by the Troy Union Railroad Company; that the Rensselaer & Saratoga bridge crossing the Hudson river might be used by the different railroad companies, but that the bridge was to remain the property of the Rensselaer & Saratoga Railroad Company; that the sev-

eral railroad companies should have equal rights and privileges in the track and passenger house of the Troy Union Railroad Company; that each constituent company should be entitled to have three directors in the Troy Union Railroad Company; and that the remaining directors should be elected by unanimous vote. It was provided in section 21 that "the stock and property of the Troy Union Railroad Company shall belong equally" to the Rensselaer & Saratoga, Schenectady & Troy, Hudson River, and Troy & Boston Companies, subject to said mortgage and the payment of said bonds. Section 17 is as follows:

"17. The party of the first part agrees that the common council of the city of Troy shall join in an application to the Legislature of the state of New York, that the Troy Union Railroad Company be exempt from taxation upon an amount exceeding the present amount of its capital stock, and that no tax shall be imposed upon the Rensselaer & Saratoga Railroad Company on account of the proposed addition to the said bridge. And if such law shall not be passed, the common council of the city of Troy shall refund to the Troy Railroad Company an amount equal to the city taxes imposed on the Troy Union Railroad Company for any valuation exceeding its present capital stock, and shall also refund to the Rensselaer & Saratoga Railroad Company an amount equal to the city taxes imposed on the Rensselaer & Saratoga Railroad Company on account of the said bridge for any valuation exceeding the present valuation."

Thereafter the commissioners named in the act of 1851 (chapter 255) located the line of the proposed new railroad, which was adopted by the Troy Union Railroad Company and by the common council of Troy. That company thereupon purchased the necessary lands, taking the title thereto in its own name, constructed the railroad, and erected the passenger house at a total cost of $707,000, all of which was obtained from the sale of the bonds of the city of Troy, which were secured by the mortgage hereinbefore mentioned. The Legislature, by chapter 462 of the Laws of 1853, thereafter passed an act providing for the taxation of the property of the Union Railroad Company. That act provided that:

"For the purposes of taxation in the city of Troy, and in the county of Rensselaer, the property of the Troy Union Railroad Company shall be estimated and assessed (as the common council of said city of Troy, by its contract with said company, dated December third, eighteen hundred and fifty-two, agreed that the same should be) at the amount of the capital stock of said company, and no more."

It appears that thereafter these four railroad companies, or some of them, made default in paying interest upon the bonds, and that in 1857 the city of Troy commenced an action to foreclose its mortgage and enforce the indemnity agreements of the four companies. To that action the Troy Union Railroad Company and the four other railroad companies were parties. The action was settled by a new agreement, which bears date July 1, 1858, and which took the place of the contract of December 3, 1852. It was recited in the preamble to such new agreement that:

"The parties hereto, for the purpose of settling the matters involved in said suit, and for the purpose of reforming the contract entered into by or on behalf of the above-named parties bearing date the 3d day of December, 1852, adopt this instead of and in place of the said contract, which is hereby annulled."

The parties to the new agreement were the city of Troy, the Union Railroad Company, the Rensselaer & Saratoga Railroad Company, the New York Central Railroad Company, which in the meantime had leased the Schenectady & Troy Railroad, the Hudson River Railroad Company, and the Troy & Boston Railroad Company. In the new or reformed contract it was provided that the Troy Union Railroad Company might continue to operate its railroad in the city of Troy as now located and constructed; that such company should raise by monthly assessments all sums necessary to pay its expenses of every kind; that the four constituent railroad companies should each pay to the Troy Union Railroad Company, monthly, one-quarter part of the assessment; that if any of them should make default in payment of the assessment it might be excluded from the use of the tracks of the Troy Railroad Company, its passenger house, and other property until payment; and that each of the four constituent companies should own one-fourth of the stock of the Troy Union Railroad Company, and have equal rights and privileges in the track, passenger house, and other property of the Troy Union Railroad Company. Section 7 of this reformed contract is as follows:

"The New York Central Railroad Company and the Hudson River Railroad Company shall each own one-fourth part, and the Rensselaer & Saratoga Railroad Company and the Troy & Boston Railroad Company shall each own one-fifth part, of the railroad, passenger house, and all other property, rights, and franchises of the Troy Union Railroad Company, subject to the lien of the mortgage thereon to the city of Troy."

Section 11 of said reformed contract is as follows:

"The party of the first part (city of Troy) agree that if the law passed by the Legislature of the state of New York June 24, 1853, relative to the taxation of the property of the Troy Union Railroad Company in Troy, shall at any time be repealed, the common council of the city of Troy shall join in an application to the Legislature of the state of New York that the Troy Union Railroad Company be exempt from taxation upon an amount exceeding the present amount of its capital stock, and that no tax be imposed upon the Rensselaer & Saratoga Railroad Company on account of the proposed addition to the said bridge, and, if such law shall not be passed, the common council of the city of Troy shall refund to the Troy Union Railroad Company an amount equal to the city taxes imposed upon the Troy Union Railroad Company for any valuation exceeding its present capital stock, and shall also refund to the Rensselaer & Saratoga Railroad Company an amount equal to the city taxes imposed on the Rensselaer & Saratoga Railroad Company on account of the said bridges, for any valuation exceeding the present valuation."

It is not necessary to refer to the other provisions of the new contract. It has been in force ever since. No formal deed of conveyance was ever executed by the Troy Union Railroad Company conveying the railroad, the passenger station, or other property to the four other companies, or either one of them. The bonds secured by the mortgage referred to have all been paid, and the mortgage was discharged of record July 26, 1901. Subsequently to July 1, 1858, the New York Central Railroad Company and the Hudson River Railroad Company were consolidated, and became the New York Central & Hudson River Railroad Company. The Troy & Boston Railroad Company was consolidated

with the Fitchburg Railroad Company, and the consolidated railroad
was leased to the Boston & Maine Railroad. In 1871 the Rensselaer &
Saratoga Railroad was leased to the Delaware & Hudson Company.

The Troy Union Railroad Company still maintains its corporate ex-
istence, and its capital stock still remains at the sum of $30,000. It
elects its board of directors annually, and has since its organization
maintained the road and passenger house or station, keeping them in
proper repair, and has rebuilt the station three times. It keeps the sta-
tion property insured in its own name, employs flagmen and gatemen
in different parts of the city, has erected signal towers, and employs
signalmen for operating them. It rents parts of the station property
not required for the common business of the several companies using
the same, but it does not operate and never has operated any trains;
it owns no locomotives, passenger cars, freight cars, or baggage cars;
it carries no passengers and conducts no transportation business; the
men employed to take care of the tracks, and the flagmen and gatemen
at crossings, are paid by the several other railroads using the tracks, in
proportion to their stock ownership. The ticket agents who sell tickets
for the several roads interested make direct returns to their respective
companies, and the Troy Union Railroad gets none of the receipts from
such sales. The Troy Union Railroad Company pays no dividends, its
receipts and disbursements being equal each year; its disbursements
being provided for by a pro rata assessment made upon the railroad
companies now owning its stock. When the passenger house or station
was last rebuilt, it was paid for by the three railroad companies owning
its stock. The New York Central and the Hudson River Railroad
Companies having been consolidated, the New York Central & Hudson
River Railroad Company paid one-half of such expense, the Boston &
Maine Railroad Company paid one-quarter, and the Delaware & Hud-
son Company paid one-quarter.

From 1858 to 1886 the Troy Union Railroad Company was assessed
by the city of Troy at $30,000, the amount of its capital stock, and no
more. In 1886 and 1887 the assessors of the city of Troy assessed the
Troy Union Railroad Company for its railroad, passenger station and
other real estate, $783,984 in each year. Those assessments were re-
viewed upon writs of certiorari, and it was held that the act of the
Legislature (chapter 462 of the Laws of 1853) was valid and that the
assessments were erroneous. People ex rel. Troy Union R. R. Co. v.
Carter, 52 Hun, 458, 5 N. Y. Supp. 507, affirmed 117 N. Y. 625, 22 N.
E. 1128. Thereafter the city of Troy continued the assessment at $30,-
000 through the year 1906. In 1907 and 1908 and 1909 assessments
for the property in question were made against all four railroad com-
panies, including the Troy Union Company, at a higher amount. Pro-
ceedings were taken to review these assessments, as well as those made
by the state board of tax commissioners upon assessments under the
Special Franchise Tax Law, but these proceedings never came to an
adjudication; they having been argued before the late Justice George
H. Fitts, who died without reaching a decision upon them. In 1909 a
settlement of all the proceedings then pending was made on the basis
of paying the taxes levied on the assessments of 1907, 1908, and 1909,

and canceling the special franchise assessments which had been made from 1901 to 1909.

In 1909, by chapter 201 of the Laws of that year, the Legislature passed an act repealing chapter 462 of the Laws of 1853, which was the act providing for the taxation of the property of the Union Railroad Company. The claim is made on the part of the relators here that this repealing act is unconstitutional, because its effect was the impairment of a contract, and therefore that it was in contravention of subdivision 1 of section 10 of article 1 of the Constitution of the United States, which prohibits the passage by any state of any act impairing the obligation of a contract. It is also claimed by the relators that the assessment in question is invalid, because it is not made against the Troy Union Railroad Company alone, which the relators claim is the owner of the real property taxed. The referee has found that the repealing act is constitutional and valid, and that the contract of July 1, 1858, was not in legal effect a deed or instrument conveying the title of the Troy Union Railroad Company and its property in question to the relators, or any of the several other railroad companies. He reported in favor of dismissing the petitions and quashing the writs with costs.

The position of the relators with respect to the constitutional question involved seems to be that by reason of the contract of December 3, 1852, the city of Troy obtained substantial benefits from the several railroad companies by eliminating their use of River street for their roads and by procuring a single road and a single passenger house for the common use of all, and that the state, by passing the act (chapter 462 of the Laws of 1853) authorizing an assessment of the property of the Troy Union Railroad Company at an amount equal to its capital stock of $30,000 and no more, became a party to that contract, and, being a party, it was without power under the federal Constitution to pass the repealing act (chapter 201 of the Laws of 1909).

It is conceded that the city of Troy had no power to make an effective agreement exempting property from taxation. In the contract of 1852 that principle was recognized, and the city did not assume to so agree; but it did not agree to join in an application to the Legislature for the passage of a law which would permit such exemption. The city kept its agreement in that respect, and joined with the others interested, and procured the passage of the law. Before it was passed, however, the Troy Union Railroad Company had been fully organized under the General Law, and its capital had been furnished. The Troy Union Railroad Company was not required by the act to give anything or to do anything for the state as a consideration for the exemption. It appears very clearly that the act was wholly voluntary, and based upon no consideration whatever passing to the state. Neither was the state, in form, a party to the contract. It does not appear to me that by the mere passage of the act of exemption, made at the request of the parties to the contract, the state made itself a party thereto. It merely yielded its assent to make legal that which the parties themselves could not legally accomplish; that is, the exemption of very considerable amounts of property from taxation. If the state was not a party to the contract, it follows as a matter of course that the act

authorizing the exemption cannot be deemed to create a contract between the state and the Troy Union Railroad Company. If that is the correct view of the law, the act creating the exemption could be repealed at any time.

It appears that the contract of December 3, 1853, was expressly annulled and replaced by the later contract of July 1, 1858, between the city of Troy, the Troy Union Railroad Company, and the other railroad companies. In this later contract it was expressly recognized by the parties that the Legislature might repeal the exemption passed, because it is there stated that, if that law should "at any time be repealed," the common council would join in an application to the Legislature for another act of exemption from taxation upon an amount exceeding the present amount of its capital stock, and that if such law should not be passed the common council would refund to the company an amount equal to taxes imposed for any valuation exceeding its present capital stock. That agreement to apply again to the Legislature for renewal of the exemption was decided to be illegal and ultra vires by the trial court in People ex rel. Troy Union R. R. Co. v. Carter, supra, although this principle is not referred to in the published report of the decision on appeal, but it is contained in the findings of the court contained in the printed case on appeal, which forms a part of the record now before the court.

If by any sort of reasoning it can be claimed that the exemption statute of 1853 was a part of the original charter of the Troy Union Railroad Company, the right to repeal it is saved by the provision of article 8, § 1, of the New York state Constitution of 1846, which provided that all general laws and special acts creating corporations passed pursuant to that section of the Constitution may be altered from time to time or repealed. But, as I view it, the exemption statute cannot fairly be regarded as a part of the original charter for the reason that the Troy Union Railroad Company was chartered under the general law. The state by the repealing act has not assumed to change or alter any provision of the charter of the Troy Union Railroad Company. It merely repealed the act granting the exemption, and if, as I think, it was not a party to the contract between the city and the railway companies, and its act in granting the exemption was simply a gratuitous or voluntary one made at the request of the parties, there is no constitutional prohibition of its right to repeal the act. This view, I think, is amply sustained by the authorities.

In Tucker v. Ferguson, 89 U. S. (22 Wall.) 527, 22 L. Ed. 805, it was held that an act of the Legislature exempting the property of a railroad from taxation is not a "contract" to exempt it unless there be a consideration for the act; that an agreement where there is no consideration is void; that it was the promise of a gratuity, spontaneously made, which may be kept, changed, or recalled at pleasure; and that this rule of law applies to the agreements of states, made without consideration, as well as to those made by individuals.

In West Wisconsin R. Co. v. Supervisors, 93 U. S. (3 Otto) 596, 23 L. Ed. 814, the Legislature of Wisconsin passed an act providing that all the lands of the railroad company should be exempt from taxation for 10 years. Later the exemption from taxation was ex-

tended for a period of 10 years. Thereafter the Legislature enacted that certain lands of the company should be liable to taxation, the same as other real estate. After the levying of a tax, its validity was questioned by the railroad, and the court held, following the principle of the Tucker Case, above cited, that the exemptions in question were gratuities offered by the state, without any element of a contract, and that there was no assurance or intimation that they were intended to be irrevocable, or that the laws in question should not be at all times subject to modification or repeal in like manner as other legislation. The validity of the tax was therefore upheld.

In Rector, etc., of Christ Church v. County of Philadelphia, 65 U. S. (24 How.) 300, 16 L. Ed. 602, the Legislature of Pennsylvania had passed an act declaring:

"That the real property, *including ground rents*, now belonging * * * to Christ Church Hospital, in the city of Philadelphia, so long as the same shall continue to belong to the said hospital, shall be and remain free from taxes."

Later the Legislature passed a law which subjected the *ground rents* to taxation. The Supreme Court of Pennsylvania sustained the validity of the latter act. The case was then taken by writ of error to the United States Supreme Court, where it was insisted that the act of exemption was a contract in perpetuity, and was protected by the contract clause of the federal Constitution; but that court unanimously affirmed the judgment of the Supreme Court of the state, and held that the exemption was contained in an act which required the imposition of no service or duty or other remunerative condition on the corporation, that it was simply in the nature of a privilege, and that the act creating the exemption might be revoked at the pleasure of the sovereign.

The case last cited was followed in People ex rel. Davies v. Commissioners of Taxes, 47 N. Y. 501, where it was held that the provisions of chapter 257 of the Laws of 1822, which enacted that no property of the Society of the New York Hospital should be subject to be taxed by virtue of any law of this state, did not constitute a contract, but was a spontaneous concession of the Legislature, not connected with any service or duty imposed upon the corporation, and that it was therefore subject to modification or repeal.

I am unable to agree with the contention of the defendants that by reason of the contracts of 1852 and 1858 the title to the property against which the assessment in question has been made has passed from the Troy Union Railroad Company to the several other railroad companies who own its stock. It appears that the title to the real estate which was procured for the building of the road was taken in the name of the Troy Union Railroad Company. Its passenger house or station has been and is insured in its name. It has done many acts, by way of making leases and otherwise, inconsistent with the idea that the other railways own the fee of the property in question. The claim that the title has passed to the other railways is based largely upon statements made in the two contracts; for instance, in the contract of 1852 it is stated that "the stock *and property* of the Troy Union Railroad Company *shall belong equally*" to the several other railroads sub-

ject to the mortgage, and in the new contract of 1858 it is provided the New York Central and Hudson River Companies "shall each *own* one-fourth part" and the Rensselaer & Saratoga and Troy & Boston Companies "shall each *own* one-fifth part" of the railroad, passenger house, and all other *property,* rights, and franchises of the Troy Union Railroad Company, subject to the lien of the mortgage thereon to the city of Troy. Neither of these contracts was in the form of a deed of conveyance, and the property was not described, except in this general way, and they are not, in my judgment, sufficient to pass the fee. I think, however, that they are sufficient to pass a taxable interest in the real estate. It is unimportant to determine just what that interest is, whether it is a lease in perpetuity of the freehold, or whether it is a qualified fee or otherwise. Whatever it is, it is a freehold estate. It is clear that the entire beneficial use and enjoyment in this real estate is in the relators and the other railroads concerned, and that such beneficial use and enjoyment is an interest in realty, and an interest which is subject to taxation.

The Tax Law (Laws 1909, c. 62; Consol. Laws, c. 60), in subdivision 3 of section 2, defines the terms "land," "real estate," and "real property," in language broad enough to include the property in question, and section 3 of the Tax Law provides that "all real property within the state * * * is taxable unless exempt from taxation by law." The right given by the Troy Union Railroad Company to these railway companies to use the property in question perpetually is an estate in lands, and, being so, it is an estate that is taxable, without regard to the question as to where the technical legal title in fee simple absolute may be.

The Troy Union Railroad Company is a railroad corporation in name only, and the constituent companies are occupying and using, without any restrictions whatever, the property in question under what may fairly be regarded as a perpetual lease thereof, if not an estate of a higher character. That being so, I am inclined to the view of the counsel for the defendants that the form of the assessment in this case must be sustained, because, if the Troy Union Railroad Company is the sole owner and has the sole taxable title to the properties in question, it does not invalidate the assessment against it by adding the names of others as owners, so long as the identity of the property is established. The assessment is aimed to reach the real estate, and is in rem, and not in personam. The assessment in the form it is made in this case would appear to be saved by the provision of the charter of the city of Troy that:

"No assessment hereafter made in said city shall be held to be invalid because the same may be made out, in terms, against * * * a company * * * in whom is the record, though not the actual, title to the property, or for any cause arising through ignorance or mistake as to the name of the owner or owners of the property assessed, whether an individual or a corporation, provided that such property is sufficiently described on the assessment rolls to identify and indicate the particular property which it was intended to assess." Laws 1892, c. 670, tit. 7, § 1.

Then there is a provision in section 9 of the Tax Law, as amended by chapter 315 of the Laws of 1911, that:

"Real property shall be assessed in the tax district in which it is situated. In all cases the assessment shall be deemed as against the real property itself, and the property itself shall be holden and liable to sale for any tax levied upon it."

I agree, therefore, with all the conclusions of the learned referee, and will adopt his findings, his refusals to find, and his report, that the petitions in each case should be dismissed and the writ of certiorari quashed, with costs.

Ordered accordingly.